UNITED STATES, Appellee

v

EARL F. WHEELER, Private, U. S. Army, Appellant

17 USCMA 274, 38 CMR 72

No. 20,101

November 17, 1967

*Captain Dennis R. Hunt* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Lieutenant Colonel Martin S. Drucker,* and *Major David J. Passamaneck.*

*Captain William R. Steinmetz* argued the cause for Appellee, United States. With him on the brief were *Colonel Peter S. Wondolowski* and *Lieutenant Colonel David Rarick.*

### Opinion of the Court

FERGUSON, Judge:

Tried by general court-martial convened by the Commanding General, 1st Infantry Division, the accused, upon his plea of guilty, was convicted of absence without leave, in violation of Uniform Code of Military Justice, Article 86, 10 USC § 886, and sentenced to bad-

**274**

conduct discharge, forfeiture of all pay and allowances, and confinement at hard labor for one year. With a reduction in the period of confinement to nine months, intermediate appellate authorities affirmed. We granted accused's petition for review on issues dealing with the law officer's instructions on sentence and trial counsel's argument for imposition of a severe sentence. As these assignments are intermeshed, we will discuss them together.

I

Accused absented himself without leave for a period of approximately seventeen weeks. Evidence of two previous convictions was introduced. One involved two brief absences and the other an absence of eight days and one of slightly over nine weeks. All the offenses, including that of which accused now stands guilty, occurred in 1965 and 1966. During the fourteen-month period extending from June 2, 1965, to October 8, 1966, Wheeler was absent without leave a total of 207 days. In addition, he served confinement as a result of his last previous conviction from April 9, 1966, to May 24, 1966. One week after returning to duty, he absented himself for the period here involved. Hence, in fourteen months, accused was only available for duty less than half that time.

Contrasting with this harsh portrait of a recidivistic absentee, however, is the evidence relating to his prior military service between September 15, 1947, and the day in June 1965 on which his first recorded delict occurred. During that period, he rose to the grade of Sergeant First Class E-6. He served as a combat medic, first sergeant, and operations sergeant in Korea in four campaigns. Until June 1965, his conduct and efficiency ratings were uniformly excellent. He was thrice awarded the Good Conduct Medal and holds numerous campaign ribbons. In addition, he was wounded in action in Vietnam, for which he received the Purple Heart medal.

Asked to explain what happened to effect such a great change in his military career at a stage when he was approaching the possibility of retirement, the accused attributed his downfall to compulsive drinking, commencing with detecting his wife in unfaithfulness while stationed at Fort Riley, Kansas, and thereafter losing both her and their children. In addition, he blamed himself for the untimely death of a young assistant during the operation in Vietnam in which he was wounded. After ending his final unauthorized absence, he had apparently obtained psychiatric assistance from Army medical authorities and alleged to the court:

". . . I know I have ruined my last eighteen months. I haven't been worth while to the Army or to anyone else, but I do understand my faults and I'd like to have another chance to finish up my service. I am willing to accept everything you sentence, to go to jail or whatever it is. I would like to finish up my duty."

Defense counsel made a lengthy and vehement argument in which he referred at length to accused's long and honorable prior service; his difficulties; that psychiatric help had now been provided him; and, even though stiff confinement was adjudged, pleaded for the accused that a punitive discharge not be included in the sentence.

In reply, trial counsel emphasized accused's more recent record and referred to his previous failure to rehabilitate himself. He argued that the "court is not trying the accused for his previous record of service," invited it to disregard such, and contended "this accused should receive the maximum penalty . . . which you are authorized to impose."

Thereafter the law officer instructed the court on the maximum sentence. Except for matter relating to the mechanics of voting on a penalty, his entire advice consisted of the following statement:

"Gentlemen, of the court. You are advised that the maximum punishment which may be imposed for the offense of which the accused stands convicted is dishonorable discharge, total forfeitures, reduction to the

**275**

grade of E-1 and confinement at hard labor for one year."

Not a word was said about the evidence in mitigation or aggravation, nor was any information imparted concerning the respective contentions of counsel, the effect of a guilty plea, the possibility of lesser punishments, or any other matter.

## II

The Government contends the only positive requirement for sentence instructions by the law officer is to inform the court-martial of the maximum penalty or, in the case of previous convictions affecting that maximum, the role which they play in authorizing a punitive discharge. Relying primarily on United States v Turner, 9 USCMA 124, 25 CMR 386, it urges that any additional advice is confided solely to the law officer's discretion and, absent a request by defense counsel, it cannot be held that discretion was abused. On the other hand, the defense points out that this Court has never precisely delineated the scope of the law officer's responsibility in this area and urges that the circumstances, including the trial counsel's argument, are such as to require the law officer to give further instructions in this area. We believe the importance of the question presented calls for a definitive approach to the issue of the law officer's responsibility.

Our inquiry must of necessity begin with the Uniform Code of Military Justice and the nature of court-martial sentences. With the exception of specified instances of mandatory punishments of death or life imprisonment, almost every offense under the Code is left to be punished "as a court-martial may direct." The only restrictions to be found on that power are in the codal prohibition against cruel and unusual punishment and in the authority granted the President to prescribe maximum limitations on the discretion thus conferred upon the court-martial. Code, supra, Articles 55, 56, 10 USC §§ 855, 856. The President, of course, has prescribed such limitations with respect to most offenses. See Manual for Courts-Martial, United States, 1951, paragraph 127c.

Still, a vast discretion is vested in the court members and, unlike their civilian counterparts, they have a variety of punishments from which to choose. Thus, while a judge or jury, as the case may be, normally imposes only a sentence to confinement or fine, military tribunals go beyond these ordinary punishments and, for example, are permitted also to reduce an individual to the lowest enlisted grade, exact forfeitures from him over a period of time, reprimand him, or direct his punitive separation from the service.

The severity of these penalties, unknown to civil life as they are, cannot be denied. In the present days of military economy, to deprive a noncommissioned officer of his rank alone is, in essence, to effect financial retribution of the immense sum he would otherwise have accrued during the years it may take him to regain his former position. In like manner, the ordering of a punitive discharge so characterizes an individual that his whole future is utterly destroyed. He is marked far beyond the civilian felon, hampered as he may be by the sneering term "ex-con," for, justifiedly or not, the punitive discharge so dishonors and disgraces an accused that he finds employment virtually impossible; is subjected to many legal deprivations; and is regarded with horror by his fellow citizens. Truly, it has come to be the modern equivalent of the ancient practice of branding felons, and the stain it leaves is as ineradicable. And, in the case of a soldier with extended service, the discharge can be even more severe, for, as the Chief Judge wisely noted in United States v Prow, 13 USCMA 63, 32 CMR 63, at page 64, "an executed punitive discharge terminates military status as completely as an executed death penalty ends mortal life."

Contrary to the Government's argument that the law officer need only instruct the court-martial on the maximum sentence, this Court has always insisted the members be furnished with adequate guidance regarding the exercise of their discretion in reaching an

appropriate punishment. As early as United States v Linder, 6 USCMA 669, 20 CMR 385, Chief Judge Quinn declared, at page 674:

". . . The law officer must provide the court members with appropriate instructions on the law which applies to all matters to be decided by them. He should not require or expect the court members to consult other sources for the law. See United States v Lowry, 4 USCMA 448, 16 CMR 22. And his responsibility in that regard does not end with the findings. In United States v Strand, 6 USCMA 297, 306, 20 CMR 13, we said: 'Until the sentence proceedings are complete, the trial is not ended.' Until the trial ends the law officer must supply the court members with adequate legal assistance."

And, while the question then before us was one of inconsistency in the sentence, the Chief Judge again noted in his separate opinion in United States v Cleckley, 8 USCMA 83, 23 CMR 307, at page 87, that, without adequate instructions, the court-martial "cannot make an intelligent determination of an appropriate sentence."

In *Turner,* supra, on which the Government relies here, we dealt only with the total absence of any instructions, including advice on the maximum sentence. As we have since stated, we there decided only the question then before us, and the decision is no authority for the proposition that the law officer may, with impunity, so limit his instructions in every case. See United States v Hutton, 14 USCMA 366, 34 CMR 146, and United States v Yocom, 17 USCMA 270, 38 CMR 68.

The last cited cases, indeed, epitomize the subject on which we now dwell. In each of those cases, advice was given as to the maximum sentence, but in neither was the court-martial informed that the punitive discharge therein was only a permissible additional punishment, based, in the one instance, on evidence of previous convictions, and, in the other, on the fact that charges permitting confinement in excess of six months were tried together. In each,

we pointed out the need for enlightenment of the court-martial in order that it might be led to adjudge an appropriate sentence. As the Court said in United States v Rake, 11 USCMA 159, 28 CMR 383, at page 160:

"So far as instruction on the sentence is concerned, the basic requirement is that the court-martial be properly advised of the legal limitations of punishment. That is not all. Since the court-martial is not bound, except in certain cases, to adjudge a maximum sentence, it is appropriate for the law officer to provide 'general guides governing the matters to be considered in determining the appropriateness of the particular sentence.' United States v Mamaluy, 10 USCMA 102, 106, 27 CMR 176.'"

See also United States v Cook, 11 USCMA 579, 29 CMR 395.

Summed up, then, the whole thrust of this Court's opinions regarding presentence instructions has been to require the law officer to delineate the matters which the court-martial should consider in its deliberations. While the law officer has some discretion in this regard, we have expressly noted that such "ought not to have the same restraining effect during the sentence procedure." United States v Cook, supra, at page 581. This is particularly true in light of the range of punishments to which a military accused may be subjected under the Code—"as a court-martial may direct"—when compared to those imposable by a civil court. In short, we reiterate here the duty of the law officer to tailor his instructions on the sentence to the law and the evidence, just as in the case of his prefindings advice. United States v Yocom, United States v Hutton, both supra.

Under the circumstances of this case, we are not satisfied that this standard is met by a mere rote instruction on the maximum imposable sentence. Here, the accused presented evidence of extensive honorable service to his country as a career noncommissioned officer. All his offenses were of a military na-

**277**

ture and had occurred in the fourteen months prior to his trial. It is apparent they resulted from his alcoholism, said to have been motivated, in turn, by his serious domestic problems. It further appeared that he had, for the first time, received medical aid in connection with his difficulties and sought an opportunity to finish out his service and rehabilitate himself. Trial counsel, however, argued to the court that these matters should not be considered, as it was "not trying the accused for his previous record of service," and demanded the maximum penalty. Both he and defense counsel were acting as advocates, and their inherently opposed views as to what the court-martial could consider should have alerted the law officer to the need to instruct the court-martial on its responsibilities, particularly with respect to the exercise of its sentencing discretion in light of the evidence in mitigation and extenuation. At the same time, the Government was likewise entitled to have advice presented regarding the other side of the coin, namely, that the retention of the accused was totally unjustified in light of his inexcusable failure to remain present for duty. We take no sides on the issue. We merely emphasize the duty of the law officer to advise the court-martial of the nature of its sole responsibility for the sentence; the exercise of its duty; and what it was entitled to consider.

In this respect, we call attention to the decision in United States v Cook, supra, which involves almost identical circumstances. There, as here, the accused had long and honorable service. There, as here, extensive evidence was presented in extenuation and mitigation. While the particular matter in that case related to accused's mental state as opposed to Wheeler's domestic difficulties and their result, the same conclusion must obtain, namely, that the failure to give advice to the court-martial was erroneous and, in light of the near-maximum sentence adjudged, prejudicially so.

Of course, there will be many cases in which the situation will be such that either there is nothing for the law officer to embody in his advice to the court or in which the accused's own evidence leaves nothing to be said. In such instances, though omission of the full advice as to the court's discretion is erroneous, the limitation of his instructions may not be prejudicial. See United States v Mabry, 17 USCMA 285, 38 CMR 83, this day decided. Nevertheless, to avoid the possibility of prejudice and consequent reversal, we urge law officers carefully to shape their instructions on the sentence to the evidence presented and to inform the court members fully as to their responsibilities. The Army has long provided suggested instructions fulfilling the latter function. See Appendices XXXII, XXXIII, Department of the Army Pamphlet No. 27–9, Military Justice Handbook: The Law Officer, April 1958, paragraph 89. Indeed those instructions would have been peculiarly appropriate here, for they refer to the need to consider "the background and character of the accused; . . . the . . . record of the accused in the service for good conduct, . . . [and] other traits which characterize a good soldier;" the plea of guilty; and other matters which the court should consider. In addition, they place emphasis on its sole responsibility to select an appropriate sentence within the limits prescribed by law. *Id.,* Appendix XXXIII. We have seen similar instructions in nearly every Army case before us. In light of our prior decisions, we wonder at their absence here.

The decision of the board of review is reversed and the record of trial is returned to the Judge Advocate General of the Army. As the lack of instructions principally went to the question of a punitive discharge, the board may either disapprove that portion of the sentence or order a rehearing thereon.

Judge KILDAY concurs.

QUINN, Chief Judge (concurring in the result):

In instructing the court-martial on the issues it must consider in determination of the accused's guilt or innocence, it is certainly not error for the law officer to omit instructions as to matters not raised by the evidence. In my opinion, that rule is equally appli-

cable to instructions in regard to the sentence. Consequently, I disagree with the holding in the principal opinion that, even in cases in which "there is nothing for the law officer to embody in his advice to the court," it is error to limit the instructions to a statement of the maximum permissible punishment. However, I agree that, in the circumstances of this case, especially in light of trial counsel's argument, the law officer should have provided more meaningful instructions on the sentence factors. I, therefore, join in the disposition directed by the Court.